XAVIER BECERRA, State Bar No. 118517
Attorney General of California
MICHELLE L. ANGUS, State Bar No. 210031
Supervising Deputy Attorney General
WILLIAM J. DOUGLAS, State Bar No. 125079
Deputy Attorney General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7340
 Fax: (916) 324-5205
 E-mail: William.Douglas@doj.ca.gov
*Attorneys for Defendants Clark, Kim, Liberstein, Macias, McGuinness, Nareddy, Neubarth, Nguyen, Rouch, and Wang.*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| **RENO RIOS,** <br><br> Plaintiff, <br><br> v. <br><br> **CONNIE GIPSON, et al.,** <br><br> Defendants. | 1:12-cv-01334 LJO-SKO (PC) <br><br> **DECLARATION OF DR. B. FEINBERG IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

I, B. Feinberg, M.D., declare:

1. I have been employed by California Correctional Health Care Services (CCHCS) since 2010. In 2017, I was appointed as the Chief Medical Consultant for the CCHCS's Office of Legal Affairs. As Chief Medical Consultant, my duties include reviewing medical records, reviewing medical care issues and providing direct medical care to inmates.

2. I received my Doctorate of Medicine degree from the University of California San Francisco School of Medicine in 1994. In 1997, I completed my internship and residency in Internal Medicine at the Baylor College of Medicine in Houston, Texas. I am currently licensed to practice medicine in the State of California, and am a specialist in Internal Medicine, certified

1

by the American Board of Internal Medicine. A true copy of my current curriculum vitae is attached as Exhibit "A."

3. At the request of the Office of the Attorney General, I have reviewed the following: a) Plaintiff, Reno Rios' Complaint and Amended Complaint (ECF No. 1, 12); and b) Plaintiff's complete medical records for the years March 2006 to August 16, 2012, the date Plaintiff filed his initial Complaint.

4. At the request of the Office of the Attorney General, I was asked to render my opinion on the following questions:

a) Was Plaintiff's course of asthma medications medically unacceptable under the circumstances?

b) Is there any indication from Plaintiff's medical records that Plaintiff's course of asthma medications was chosen in conscious disregard of an excessive risk to Plaintiff's health?

c) Did Plaintiff have a nerve-pain (neuropathic) condition that required Neurontin or opioid or narcotic pain medications such as Tylenol with codeine or methadone?

d) Was Plaintiff's course of treatment of neck, back and left arm complaints medically unacceptable under the circumstances?

e) Is there any indication from Plaintiff's medical records that Plaintiff's course of pain medications was chosen in conscious disregard of an excessive risk to Plaintiff's health?

5. Based on Plaintiff's medical records and the facts set forth below, my opinions are as follows:

a) Plaintiff's course of asthma medications was medically acceptable under the circumstances. Throughout the 2006-2012 time-period, Plaintiff was prescribed an Albuterol inhaler as needed (PRN). Plaintiff was also prescribed a triamcinolone (Azmacort) inhaler until November 2007, when it was discontinued and replaced with a mometasone furoate (Asmanex) inhaler. As more particularly set forth below, these asthma medications were medically acceptable under the circumstances.

b) There is no indication from Plaintiff's medical records that Plaintiff's course of asthma medications was chosen in conscious disregard of an excessive risk to Plaintiff's health.

2

As set forth in more detail below, examinations of Plaintiff revealed normal breathing with no shortness of breath, wheezing, or other objective signs of uncontrolled asthma.

  c) Plaintiff did not have a neuropathic condition that required Neurontin or opioid or narcotic pain medications such as Tylenol with codeine or methadone. As more particularly set forth below, X-rays and physical examinations revealed that Plaintiff did not have a neuropathic condition at all. Rather, Plaintiff had two mild musculoskeletal conditions. Neither of these conditions resulted in serious dysfunction or pathology requiring Neurontin or opioid or narcotic pain medications such as Tylenol with codeine or methadone.

  d) Plaintiff's course of treatment of neck, back, and left arm complaints was medically acceptable under the circumstances. Although Plaintiff had no objective signs of chronic pain, he was given a medically acceptable course of conservative treatment consisting of non-steroidal anti-inflammatory medications (which Plaintiff rejected), physical therapy, and education on stretching exercises.

  e) There is no indication from Plaintiff's medical records that Plaintiff's course of pain medications was chosen in conscious disregard of an excessive risk to Plaintiff's health. As set forth below, examinations showed that Plaintiff's range of motion was within normal limits, a steady gait, with no edema, atrophy or any other objective indications of serious dysfunction or pathology requiring a more aggressive course of treatment.

  6. I reviewed Plaintiff's Unified Health Record (UHR) for the years 2006 to 2013. An inmate's UHR contains records of the inmate's entire health history since incarceration. The records in the inmate's UHR are prepared at or near the time of the events recorded by medical staff with personal knowledge of the events recorded. They are made and kept in the ordinary course of business, and relied upon by medical staff. True copies of portions of Plaintiff's UHR are attached as Exhibits B though Q.

  7. Plaintiff's date of birth is October 23, 1963; he is currently fifty-four years old. He is approximately five-feet, seven-inches-tall and in January 26, 2011, he weighed approximately 156 pounds. (Ex. M.) He has mild dextroconvex scoliosis without dislocation or fracture and a

small bone spur (exostosis) on his left elbow. (Exs. H, P.) Plaintiff has asthma and allergies reportedly since childhood.

**ASTHMA TREATMENT:**

8. Before his arrival at California State Prison, Corcoran in February 2007, while he was housed in California State Prison, Sacramento, Plaintiff was prescribed albuterol sulfate (commonly known as "albuterol") and triamcinolone inhalers to control his asthma. (Ex. B.) After his arrival California State Prison, Corcoran in February 2007, Plaintiff continued to be prescribed albuterol and triamcinolone inhalers to control his asthma as set forth below.

9. Plaintiff's prescription for albuterol was medically acceptable under the circumstances. Albuterol is a commonly prescribed medication for asthma and effective to treat difficulty breathing, wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD). Contraindications for albuterol are a history of seizures, and certain specific allergies, such as to milk or peanuts. There were no contraindications for albuterol in Plaintiff's medical history. Albuterol has no interaction with acetaminophen, ibuprofen, naproxen, salsalate, triamcinolone or any pain medication Plaintiff was prescribed during the 2007-2012 time-period.

10. Concurrent with albuterol, Plaintiff had a prescription for triamcinolone during the time period of February 2007 to November 27, 2007. Before 2007, triamcinolone was sold under the name "Azmacort" as a corticosteroid inhaler for long-term asthma care. Triamcinolone was completely phased out in 2010 by the Federal Food and Drug Administration due to environmental concerns. Triamcinolone was effective in preventing asthma attacks, but it would not treat an asthma attack once it had already begun.

11. Plaintiff's prescription for triamcinolone was medically acceptable under the circumstances. Contraindications for triamcinolone are a history of liver or kidney diseases, and certain other disorders which were not present in Plaintiff's medical history. Triamcinolone has no interaction with acetaminophen, ibuprofen, naproxen, salsalate or any pain medication Plaintiff was prescribed during the 2007-2012 time-period.

12. Triamcinolone was deleted from CDCR formulary in September 2007. CDCR doctors are discouraged from prescribing non-formulary medications. On November 27, 2007, Dr. Loadholt discontinued Plaintiff's triamcinolone and prescribed mometasone furoate (Asmanex) instead. (Ex C.) Plaintiff's prescription for albuterol remained unchanged. (Ex. C, Ex. B.)

13. Plaintiff's prescription for Asmanex was medically acceptable under the circumstances. Asmanex is effective in the treatment of asthma for patients unresponsive to less potent corticosteroids. Like triamcinolone, Asmanex will not treat an asthma attack once it has begun. Asmanex is effective in preventing asthma attacks, and is commonly prescribed with albuterol which is to be used during an asthma attack. There were no contraindications for Asmanex in Plaintiff's medical history. Asmanex has no interaction with Plaintiff's pain medications including acetaminophen, ibuprofen, or naproxen.

14. To obtain a refill, i.e. a new inhaler, the patient must fill out a Form 7273 Healthcare Services Request and submit it before the old inhaler runs out. The reason CDCR pharmacy does not automatically issue asthma patients new inhalers is that the patient's use varies, often depending on the season, the physical activity of the patients or any number of factors.

15. Plaintiff submitted only one appeal regarding asthma. Plaintiff signed the appeal on April 17, 2008, was it assigned Institutional Log Number COR 08-02071.

16. On June 3, 2008, Defendant Dr. Kim interviewed Plaintiff for appeal No. 08-02071. Dr. Kim noted on appeal No. 08-02071 that Plaintiff's asthma medications were current.

17. Dr. Kim was correct; the Medication Administration Record shows that Plaintiff's Asmanex and albuterol prescriptions were current. (Ex. B.) Plaintiff's Asmanex and albuterol prescriptions were refillable every thirty days. (Ex. B.)

18. Plaintiff's medical records from January to June 2008, show no evidence that Plaintiff's asthma was not adequately controlled. On the contrary, Plaintiff's examination records from January to June 2008 showed no wheezing, shortness of breath or any other indications of asthma attack. (Ex. D.)

19. Plaintiff was dissatisfied with the first level response of Dr. Kim and sought review at the second level. On June 25, 2008, Defendant McGuiness reviewed Plaintiff's appeal at the second level of appeal, and found that Plaintiff had been prescribed and received albuterol and Asmanex inhalers, which are appropriate treatment for asthma. McGuiness was correct; albuterol and Asmanex inhalers were the medically appropriate treatment for Plaintiff's asthma as set forth in paragraphs 9, 13 and 18 above.

20. When Defendants Kim and McGuiness reviewed Plaintiff's inmate appeal No. COR-08-2071, it would not have been clinically indicated or appropriate to prescribe the nonformulary triamcinolone inhaler to Plaintiff because there were no written requests from a doctor and no showing of one of the three following required justifications for an exception to the formulary:

a. documented treatment failures with medications listed in the formulary;

b. a documented allergy, side effect, or adverse reaction that prevents the use of a formulary medication; or

c. medications having the potential to prevent mortality and morbidity when formulary options do not exist. The requesting clinician may be asked to supply strong supporting scientific literature with the nonformuary drug request.

**PAIN MEDICATIONS:**

21. Plaintiff claims that Defendants Kim, Clark Neubarth, Rouch, Nareddy, Nguyen and Sisodia were deliberately indifferent by not providing the similar pain medications for nerve damage as other prisons. I have reviewed Plaintiff's medical records from 2007-2012 and Plaintiff has never been diagnosed as having nerve damage or having neuropathic pain. Moreover, as set forth below, X-rays and examinations of Plaintiff during that time period ruled out the possibility of Plaintiff having nerve damage or having neuropathic pain.

22. Plaintiff claims that Defendants were deliberately indifferent by not providing the morphine, Tylenol-3 (Tylenol with codeine), Neurontin or methadone, for nerve damage as other prisons. I have reviewed Plaintiff's medical records from 2006-2012 and Plaintiff has never been prescribed morphine, Tylenol-3 (Tylenol with codeine), Neurontin or methadone, or any other narcotic for chronic pain or nerve damage.

6

23. On or about October 7, 2010, Plaintiff submitted a Form 7362 Heath Care Services Request complaining of upper-back muscle pain and stiff neck ongoing for the past six months. (Ex. E.) Plaintiff stated on his Heath Care Services Request that ibuprofen did not alleviate the pain. (Ex. E.)

24. Typical symptoms of neuropathy are radiating pain, such as sciatica or radicular pain, numbness or tingling, a reported "pins and needles" or a "burning" sensation, muscular weakness, atrophy of the muscles and tremors. On October 9, 2010, Plaintiff was seen by the Registered Nurse (RN) who examined Plaintiff' upper back and found full range of motion, with no edema, deformity, atrophy, hypertrophy, weakness or tremors. Plaintiff denied numbness and did not complain of tingling. Plaintiff's gait and stance were steady. (Ex. F.) Thus, the October 9, 2010 physical examination results are inconsistent with neuropathy. The RN also noted that Plaintiff "refused Tylenol" and "admitted to taking too much Motrin and Tylenol." (Ex. F.)

25. On October 28, 2010, Plaintiff was seen by his primary care doctor. Plaintiff denied he had trauma. The primary care doctor found no tenderness and ordered X-rays. (Ex. G.) Plaintiff told his primary care doctor that he did not want Motrin or Tylenol. The primary care doctor ordered salsalate for pain. (Ex. G.)

26. On November 3, 2010, Plaintiff's back was X-rayed at Visalia Vascular Institute. Anteroposterior (AP), lateral, and swimmer's views of Plaintiff's spine were X-rayed. (Ex. H.) The X-ray report indicated that Plaintiff's spine was within normal limits with no evidence of fracture of dislocation. (Ex. H.)

27. The X-ray report also indicated mild dextroconvex scoliosis of the mid to lower thoracic spine; which means a slight curve (usually measuring less than measuring 10-20 degrees) curving towards the right side of the body. (Ex. H.) Mild dextroconvex scoliosis can occasionally result in mild, chronic or recurring muscle pain. Proper pharmacologic treatment of muscular pain secondary to mild dextroconvex scoliosis is analgesics/non-steroidal anti-inflammatory drugs including, but not limited to aspirin, acetaminophen, ibuprofen, naproxen or salsalate.

28. On November 8, 2010, Plaintiff submitted a Form 7362 Heath Care Services Request complaining of upper-back muscle pain. (Ex. I.) The RN referred the request to Plaintiff's physician. (Ex. I.)

29. On November 28, 2010, Plaintiff submitted a Form 7362 Heath Care Services Request complaining of upper-back muscle pain that intensified with cold temperatures. Plaintiff's complaint of muscular, not neuropathic, pain is consistent with his clinical exam findings. (Ex. J.) In Plaintiff's November 28, 2010 Heath Care Services Request, Plaintiff stated that he took salsalate pill "excessively," which caused acid reflux. (Ex. J.)

30 On November 30, 2010, Plaintiff was seen by the RN for his complaint of muscle pain. Upon examination Plaintiff walked without difficulty, had a steady gait, and was able to move upper and lower extremities without difficulty. (Ex. K.) The November 30, 2010 examination results are inconsistent with a serious musculoskeletal disorder.

31. On November 30, 2010, Plaintiff told the RN: "I have salsalate, I need stronger pain meds." (Ex. K.) As set forth below, an inmate's request for stronger pain medications after rejection of several prescribed pain medications, coupled with negative objective findings is a "red flag" suggesting drug-seeking behavior.

32. On December 3, 2010, Plaintiff's primary care physician again examined Plaintiff for a complaint of muscle pain. (Ex. L.) Plaintiff's back flexion was 90 degrees, extension 30 degrees and lateral bend was 30 degrees, all within normal limits. (Ex. L.) The doctor performed the Straight Leg Raise (SLR) test, a neurodynamic test. (Ex. L.) Neurodynamic tests check the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression. SLR tests, along with relevant history and decreased range of motion, are considered by some to be the most important physical signs of disc herniation, and the SLR test is one of the most common neurological tests of the lower limb. Plaintiff's SLR test was negative for neurologic dysfunction. In addition, Plaintiff had five-out - of - five strength bilaterally and he could both tip-toe and heel-walk. These normal findings indicated that Plaintiff had no serious neurological or musculoskeletal dysfunction or pathology. Plaintiff's primary care physician recommended lower back care, stretching exercises and naproxen. (Ex. L.) Therefore, the

8

Declaration of Dr. B. Feinberg in Support of Defendants' Motion for Summary Judgment (1:12-cv-01334 LJO-SKO (PC))

December 3, 2010, history and physical examination results are inconsistent with nerve pain, or serious musculoskeletal dysfunction or pathology.

33. On or about January 11, 2011, Plaintiff submitted appeal Institutional Log Number COR-09-11-10109 requesting pain medication for his left arm and upper back.

34. On January 26, 2011, Defendant Dr. Liberstein examined Plaintiff for appeal COR-09-11-10109. (Ex. M.) Plaintiff complained to Dr. Liberstein of muscular pain and pain which was worse in the night and during cold temperatures. (Ex. M.) Dr. Liberstein ordered a physical therapy evaluation. (Ex. M.)

35. On April 12, 2011, Plaintiff was evaluated by a physical therapist who recommended posture education, and gentle flexibility exercises. (Ex. N, O.)

36. On January 26, 2011, at the examination by Defendant Dr. Liberstein, Plaintiff also complained of left arm pain for the first time. (Ex. M.) None of Plaintiff's Heath Care Services Request before appeal Institutional Log Number COR-09-11-10109 mentioned left arm pain.

37. On January 26, 2011, Dr. Liberstein ordered an X-ray of Plaintiff's left arm. (Ex. M.) The X-ray revealed that Plaintiff's arm was not dislocated; it has a small bone spur (exostosis). (Ex. P.) An exostosis is the formation of new bone on the surface of a bone. Normally, an exostosis is asymptomatic and cases are not treated. Non-steroidal anti - inflammatory drugs (NSAIDs) are the proper treatment for mild to moderate pain caused by a small bone spur. Plaintiff already had a prescription for the NSAID naproxen beginning in December 2010. (Ex. L, Q.)

38. On February 11, 2011, Defendant Dr. Clark reviewed appeal Institutional Log Number COR-09-11-10109 at the first level of review and denied Plaintiff's request for stronger pain medication for his left arm and upper back.

39. On March 11, 2011, Dr. Clark and Defendant Marcias reviewed appeal Institutional Log Number COR-09-11-10109 at the second level of review and denied Plaintiff's request for stronger pain medication for his left arm and upper back.

40. On August 21, 2011, appeal Institutional Log Number COR-09-11-10109 was denied at the Third Level of Review.

9

41. Plaintiff did not have a serious medical need for opioid (narcotic) or neuropathic pain medications during the period of 2007-2012. In my experience, inmates sometimes exaggerate their pain for secondary gain, such as narcotic or other drugs with abuse potential. I found that Plaintiff's UHR contains the following "red flags" that suggest that Plaintiff may have been trying to manipulate staff to obtain prescription medications for non-medical reasons.

- Plaintiff abused drugs, including cocaine before incarceration.
- In Plaintiff's Heath Care Service Requests, he states he is in "severe" pain, yet upon examination he has no objective signs of severe pain.
- Plaintiff refused the non-narcotic medications Tylenol, Motrin and salsalate.
- Plaintiff admitted he overdosed his Tylenol, Motrin and salsalate prescriptions.

I declare under penalty of perjury the above is true. Executed this 2nd day of February 2018 at Elk Grove, California.

Dated: 2/2/18

Dr. B. FEINBERG

SA2015302314
12920022.docx