# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RENO RIOS,<br><br>               Plaintiff,<br><br>    v.<br><br>GIPSON, et al<br><br>               Defendants. | **Case No. 1:12-cv-01334-LJO-SKO (PC)**<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMMARY JUDGMENT**<br><br>**(Doc. 88)**<br><br>**CLERK TO ENTER JUDGMENT AND CLOSE CASE** |

## INTRODUCTION

Plaintiff, Reno Rios, is a state prisoner proceeding *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. On February 2, 2018, Defendants filed a motion for summary judgment, arguing that Plaintiff cannot establish a triable issue of fact regarding the appropriateness of the medical treatment he received, that his asthma claims are barred by the statute of limitations, and that they are entitled to qualified immunity. (Doc. 88.) After multiple extensions of time and various other motions, Plaintiff filed his opposition.[1] (Docs. 111-115.) After order from the Court, Defendants filed a supplemental statement of undisputed facts. (Doc.

---

[1] Plaintiff was provided with contemporaneous notice of the requirements for opposing a summary judgment motion with Defendants' moving papers as well as separate order from this Court. *Stratton v. Buck*, 697 F.3d 1004, 1008 (9th Cir. 2012); *Woods v. Carey*, 684 F.3d 934, 939-41 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 960-61 (9th Cir. 1998). (Docs. 88, 91.)

119.) Plaintiff filed a supplemental opposition (Doc. 122) and Defendants filed a reply (Doc. 127). The motion is deemed submitted. L.R. 230(*l*). For the reasons discussed below, the Court finds that Defendants have met their burden on all of Plaintiff's claims against them and their motion for summary judgment will be granted.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Washington Mutual Inc. v. U.S.*, 636 F.3d 1207, 1216 (9th Cir. 2011). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.,* 818 F.2d 1422, 1436 (9th Cir. 1987). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas v. Ponder*, 611 F3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted). The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same. *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F.Supp.2d 1192, 1200 (S.D. Cal. 1998).

Each party's position must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); *Carmen v. San*

*Francisco Unified School Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *accord Simmons v. Navajo County, Ariz.,* 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and, in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. *In re Oracle Corp. Securities Litigation*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp.,* 627 F.3d at 387 (citing *Celotex Corp.,* 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." *Id.* (citing *Anderson.*, 477 U.S. at 252). An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *Wool v*, 818 F.2d at 1436.

In judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, *Soremekun v. Thrifty Payless Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), *cert. denied*, 132 S.Ct. 1566 (2012). The Court determines only whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a *pro se* prisoner. *Thomas*, 611 F.3d at 1150. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

## DISCUSSION

### A.    Background

This action was initially dismissed on screening for failure to state a claim and judgment was entered on April 9, 2014. (Docs. 12, 14, 15.) Following Plaintiff's appeal, the Ninth Circuit

affirmed in part, reversed in part, and remanded (Docs. 21, 23), holding that Plaintiff's First Amended Complaint, filed on June 13, 2013, (Doc. 12) set forth sufficient allegations to state claims for monetary damages arising out of inadequate medical treatment for his asthma, nerve pain, and dental issues. 28 U.S.C. § 1915A; Fed. R. Civ. P. 8; *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1116 (9th Cir. 2012). (Doc. 21.) The Ninth Circuit found that, liberally construed, the allegations in the amended complaint were "sufficient to warrant ordering [defendants] to file an answer." *Wilhelm*, 680 F.3d at 1116; *see also Colwell*, 763 F.3d at 1068 ("[T]o show deliberate indifference, the plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to plaintiff's health." (internal citations and quotation marks omitted)); c*f. Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc) (allowing jury to consider budgetary constraints under which a doctor operates in determining whether he or she is liable for money damages). Mandate issued on July 7, 2015. (Doc. 23.)

On September 7, 2017, Defendants were granted summary judgment on Plaintiff's dental claim for failure to exhaust administrative remedies prior to filing suit as required by 42 U.S.C. § 1997e(a). (Docs. 65, 81, 83.) Thus, Plaintiff proceeds in this action on his remaining claims under the Eighth Amendment against Defendants, Clark, Kim, Liberstein, Macias, McGuinness, Nareddy, Neubarth, Nguyen, Sisodia, Rouch, and Wang for deliberate indifference to his serious medical needs regarding his asthma and alleged nerve pain.

**B.     Legal Standard Under the Eighth Amendment**

"The treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Prison officials have a duty "to take reasonable measures to guarantee the safety of inmates, which has been interpreted to include a duty to protect prisoners." *Labatad v. Corrections Corp. of America*, 714 F.3d 1155, 1160 (citing *Farmer*, 511 U.S. at 832-33; *Hearns v. Terhune*, 413 F.3d 1036, 1040 (9th Cir. 2005)).

To establish a violation of this duty, the prisoner must "show that the officials acted with

deliberate indifference to threat of serious harm or injury to an inmate." *Labatad*, at 1160 (citing *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir. 2002). This involves both objective and subjective components.

First, objectively, the alleged deprivation must be "sufficiently serious" and where a failure to prevent harm is alleged, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834, quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). Second, subjectively, the prison official must "know of and disregard an excessive risk to inmate health or safety." *Id.* at 837; *Anderson v. County of Kern*, 45 F.3d 1310, 1313 (9th Cir. 1995). A prison official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and . . . must also draw the inference." *Farmer*, 511 U.S. at 837. Liability may follow only if a prison official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847.

### C.   Defendants' Motion

Defendants contend they are entitled to summary judgment on Plaintiff's asthma claim because his Triamcinolone inhaler was deleted from the formulary, and Albuterol and Asmanex inhalers were medically acceptable treatment (Doc. 88-2, pp. 17-19[2]), and Defendants Kim and McGuiness were not deliberately indifferent when they denied Plaintiff's inmate appeal regarding the treatment for Plaintiff's asthma (*id.*, pp. 19-20). Defendants also contend that Plaintiff's asthma claim is barred by the statute of limitations. (*Id.*, pp. 21-23). Defendants further contend that Plaintiff received medically acceptable treatment for his alleged "nerve pain" which warrants summary judgment in their favor. (*Id.*, pp. 23-25.) Finally, Defendants argue that they are entitled to qualified immunity on all of Plaintiff's remaining claims. (*Id.*, pp. 25-27.) As an initial premise, Defendants' evidence[3] shows that Plaintiff is a state inmate who has been incarcerated since 1989 and is serving a life sentence. (DUF[4] Nos. 1, 2.) Plaintiff was housed in

---

[2] All references to pages of specific documents pertain to those set forth on the upper-right corners by the CM/ECF electronic court docketing system.

[3] Disputes of fact shown by Plaintiff's evidence are delineated in the discussion of his opposition.

[4] "DUF" refers to Defendants' Statement of Undisputed Facts.

California State Prison, Corcoran ("CSP-Cor") at the time in question (February 15, 2007, to January 3, 2014). (DUF No. 3.) All Defendants were employed by the California Department of Corrections and Rehabilitations ("CDCR") and working at CSP-Cor at the time in question. (DUF No. 4.)

### D. Plaintiff's General Objections/Arguments[5]

As a preliminary matter, Plaintiff contends that Defendants have not properly supported their motion since they did not submit declarations from specialists on asthma and nerve pain to support Dr. Feinberg's declaration, (Doc. 111, pp. 3, 4), and that Dr. Feinberg is not qualified to submit opinions in this case because he is not a certified expert in any field and is only an expert witness for CDCR, CCHCS, and CCHP, (Doc. 122, p. 3-5).

Under the Federal Rules, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed.R.Evid. 702. Testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." Fed.R.Evid. 702. Further, the expert witness must have "applied the principles and methods reliably to the facts of the case." *Id.*

The Supreme Court has imposed a "gatekeeping responsibility" in which courts are to ensure that purportedly "expert" evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42 (1999) (clarifying the court's "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge"). Prior to considering proffered expert testimony, a trial court "must merely make a determination as to the proposed expert's qualifications." *Hopkins v. Dow Corning Corp.*, 33 F.3d 1116, 1124 (9th Cir.1994). A court is not to attempt to determine whether an expert's conclusions are correct, but rather examine only "the soundness of his methodology." *Daubert,*

---

[5] Plaintiff's argument that Defendants are not entitled to summary judgment because they failed to answer the amended complaint (Doc. 111, p. 4) is disregarded since incorrect. (*See* Docs. 30, 42.)

43 F.3d at 1318.

Dr. Feinberg's declaration indicates he received his Doctorate of Medicine degree from the University of California San Francisco School of Medicine in 1994, and, in 1997, he completed his internship and residency in Internal Medicine at the Baylor College of Medicine in Houston, Texas. (Doc. 88-5, Feinberg Decl., ¶2.) Dr. Feinberg is currently licensed to practice medicine in the State of California, and is a specialist in Internal Medicine, certified by the American Board of Internal Medicine. (*Id.*) Dr. Feinberg was appointed as the Chief Medical Consultant for CCHCS's Office of Legal Affairs in 2017 and his duties include reviewing medical records, reviewing medical care issues and providing direct medical care to inmates. (*Id.*, at ¶1.) Thus, Dr. Feinberg possesses the "knowledge, skill, experience, training, [and] education" sufficient to qualify as an expert pursuant to Rule 702. Plaintiff's objection that Dr. Feinberg is not qualified to submit opinions in this case is overruled. Further, Plaintiff's suggestion that Dr. Feinberg is not a certified expert in any field is not supported by any evidence and is directly contradicted by Dr. Feinberg's declaration that he is a specialist certified by the American Board of Internal Medicine. Further, Plaintiff objects that Dr. Feinberg is not qualified to present expert opinions in this case since his job is only as an expert witness for CDCR, CCHCS, and CCHP. However, such a bare assertion of unreliability is insufficient to challenge an expert's report. *Tetsuo Akaosugi v. Benihaha Nat'l Corp*., 282 F.R.D. 241 (N.D.Cal. 2012).

Plaintiff also contends that Dr. Feinberg's declaration is insufficient to meet Defendants' burden moving for summary judgment because Dr. Feinberg's opinion is only based on Dr. Feinberg's review of Plaintiff's medical chart, and did not review Plaintiff's records back to 1998. (Doc. 122, pp. 3, 7.) Plaintiff argues that Dr. Feinberg has no personal knowledge of Plaintiff, was not involved in Plaintiff's care and treatment, and that his opinions are deficient since formed without interviewing or examining Plaintiff. However, an expert's opinion need not be based on the expert's personal knowledge of the facts. *See, e.g., General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (explaining "[t]rained experts commonly extrapolate from existing data"); *Daubert*, 509 U.S. at 591 ("an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation"); *Bieghler v. Kleppe*,

633 F.2d 531, 533 (9th Cir.1980) (rejecting the argument that an expert affidavit was conclusory and inadmissible because it was based on hearsay and not personal knowledge); *Gasaway v. Northwestern Mut. Life Ins. Co.*, 820 F.Supp. 1241, 1246 n. 2 (D. Haw. 1993) (finding that under Rule 56, "[e]xpert testimony is admissible even if it is not based on first-hand knowledge of the facts"). Accordingly, Dr. Feinberg's opinion is properly considered in support of Defendants' motion for summary judgment.

Plaintiff further contends that Defendants should have submitted their own declarations detailing their involvement in Plaintiff's treatment and stating the reasons why they did not recommend referral of Plaintiff to specialists for his asthma and nerve damage/chronic pain conditions. (Doc. 122, pp. 3, 4.) However, Defendants are entitled to choose which evidence to submit in support their motion, just as Plaintiff is entitled to choose the evidence he submits in opposition. And, as discussed below, Defendants have submitted sufficient evidence to meet their burden moving for summary judgment on Plaintiff's claims against them. Likewise, Plaintiff's argument that Defendants ignored the long-standing history of his asthma condition and nerve damage/nerve pain, (Doc. 122, p. 3), without showing something definitive therein which mandated an altered course of treatment, does not show that Defendants were deliberately indifferent to his serious medical needs.

Finally, Plaintiff has not shown that he qualifies as an expert witness to be able to render contradictory opinions on the appropriateness and timeliness of the medical care he received. (*See* Fed. R. Evd. 702.) Since a lay witness, the only admissible evidence Plaintiff can provide is limited to opinions that are rationally based on his perception; that are helpful to clearly understanding his testimony or determining a fact in issue; and are not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 such as medical opinions. (*See* Fed. R. Evd. 701.)

Thus, statements in Plaintiff's declaration are admissible only in as much as they show symptoms he experienced and conversations he had with prison staff about his symptoms. Beyond this, none of the information in Plaintiff's declaration is admissible evidence upon which to meet his burden on summary judgment. The admissible parts of Plaintiff's declaration do not

show that Plaintiff's asthma was uncontrolled or that Plaintiff had nerve damage during the time in question for either condition to have amounted to a serious medical need to which Defendants' were deliberately indifferent. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (to establish a violation of the Eighth Amendment based on inadequate medical care, a plaintiff must demonstrate "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (a plaintiff must show the existence of (1) a serious medical need and (2) a deliberately indifferent response by the defendant). "A difference of opinion between a physician and the prisoner – or between medical professionals – concerning what medical care is appropriate does not amount to deliberate indifference." *Colwell*, 763 F.3d at 1068, (internal citations and quotations omitted).

## E. Defendants' Motion on Plaintiff's Asthma Claims

Defendants' evidence shows Plaintiff claims that Defendants Clark, Kim, Neubarth, Liberstein, Sisodia, and Rouch were deliberately indifferent to his serious medical need by not providing the same asthma medications as Plaintiff received in other prisons. (DUF No. 6.) Before coming to CSP-Cor, Plaintiff was prescribed albuterol and triamcinolone inhalers to control his asthma. (DUF No. 7.) Plaintiff received these medications upon arrival at CSP-Cor in February 2007, through November 2007. (DUF No. 8.)

Albuterol is effective to prevent and treat difficult breathing, wheezing, shortness of breath, coughing, and chest tightness caused by lung diseases such as asthma and chronic obstructive pulmonary disease (COPD). (DUF No. 9.) Plaintiff's prescription for albuterol was medically acceptable under the circumstances. (DUF No. 10.)

A triamcinolone inhaler will not treat an asthma attack once it has already begun. Before 2007, triamcinolone was sold under the name "Azmacort" as a corticosteroid inhaler for long-term asthma care. (DUF No. 11.) The triamcinolone inhaler was removed from CDCR formulary in September 2007. (DUF No. 13.) The triamcinolone inhaler was completely phased out of use in 2010 by the Federal Food and Drug Administration due to environmental concerns. (DUF No. 12.)

On November 27, 2007, Dr. Loadholt (not a defendant) discontinued Plaintiff's

triamcinolone inhaler and instead prescribed a mometasone furoate (Asmanex) inhaler.  (DUF No. 14.)  Plaintiff's albuterol prescription was unchanged.  (DUF No. 15.)  Asmanex is effective in the treatment of asthma for patients unresponsive to less potent corticosteroids.  (DUF No. 16.)  Unlike triamcinolone, Asmanex will treat an asthma attack once it has begun.  (DUF No. 17.)  Plaintiff's prescription for Asmanex as a replacement for triamcinolone was medically acceptable under the circumstances.  (DUF No. 18.)

Plaintiff claims that Defendants McGuinness, Clark, and Wang are liable because they denied Plaintiff's inmate appeal regarding asthma.  (DUF No. 23.)  Defendants' evidence shows that Plaintiff submitted only one appeal regarding asthma: Institutional Log Number COR 08-02071 ("Appeal 08-02071"), signed by Plaintiff on April 17, 2008.  (DUF No. 19.)  In Appeal 08-02071, Plaintiff states: "On April 7, 2008 doctor Loadholt again refused to provide my medications previously prescribed by CSP-SAC and all my chronic health problems merely because I am not dying, she denied me any medical treatment."  (DUF No. 20.)  Appeal 08-02071 did not specify which medication Plaintiff was seeking.  (DUF No. 21.)  Appeal 08-02071 also did not state that Plaintiff suffered an asthma attack because of not having appropriate medications.  (DUF No. 22.)

On June 3, 2008, Defendant Dr. Kim (not Defendant Clark or Wang) interviewed Plaintiff for Appeal 08-02071.  (DUF No. 24.)  Dr. Kim noted that Plaintiff's asthma medications were issued and current, (DUF No. 25), which is confirmed by Plaintiff's medical records, (DUF No. 26).

Plaintiff also claims that Defendants were deliberately indifferent by providing asthma medications that could only be refilled every ninety days.  (DUF No. 27.)  However, Defendants' evidence shows this claim is neither mentioned nor implied in Appeal 08-02071.  (*Id.*)  At the time of Appeal 08-02071, Plaintiff's Asmanex and albuterol prescriptions were refillable every thirty days, not ninety days as Plaintiff claims.  (DUF No. 28.)

Plaintiff's medical records show no evidence of asthma attacks during the relevant time.  (DUF No. 29.)  Plaintiff's examination records for January through June 2008 showed no wheezing, shortness of breath or any other indications of an asthma attack.  (*Id.*)

Plaintiff was dissatisfied with Dr. Kim's first level response to Appeal 08-02071 and submitted it for second level review. (DUF No. 30.) On June 25, 2008, Defendant McGuiness provided the second level review, and found that Plaintiff had been prescribed and received albuterol and Asmanex inhalers, which Defendants' evidence shows were an appropriate treatment for asthma. (DUF No. 31.)

When Defendants Kim and McGuiness reviewed Appeal 08-02071, it would not have been clinically indicated or appropriate to prescribe the nonformulary triamcinolone inhaler to Plaintiff because there were no written requests from a doctor and no showing of justification for an exception to the formulary. (DUF No. 32.) Appeal 08-02071 was denied at the Third Level on October 23, 2008. (DUF No. 33.) After their involvement in Plaintiff's appeal June 15, 2008, (Institutional Log Number COR 08-02071), Defendants McGuiness and Dr. Kim had no personal involvement in deciding the course of Plaintiff's asthma treatment. (DSSUF[6] No. 3.)

On January 27, 2012, Plaintiff was prescribed Xopenex because albuterol was deleted from the CDCR formulary. (DSSUF No. 14.) Defendants' evidence shows Plaintiff's prescription for Xopenex was medically acceptable under the circumstances. (DSSUF No. 5.) Plaintiff's Xopenex prescription continued throughout the rest of Plaintiff's stay at Corcoran. (DSSUF No. 6.)

On October 21, 2009, Plaintiff's Asmanex prescription was changed to Flovent. (DSSUF) No. 7.) Defendants' evidence shows Plaintiff's prescription for Flovent was medically acceptable under the circumstances. (DSSUF) No. 8.) On June 22, 2012, Dr. Karan documented the change from Flovent to mometasone/formoterol, known as "Dulera." (DSSUF No. 9.) Defendants' evidence shows Plaintiff's prescription for Dulera was medically acceptable under the circumstances. (DSSUF No. 10.) Plaintiff's Dulera prescription continued throughout the rest of Plaintiff's stay at Corcoran. (DSSUF No. 11.) Plaintiff's asthma was properly managed per community and prison standards of care throughout the time period February 2007 to January 2014. (DSSUF No. 12.) Plaintiff's UHR during the relevant time shows that:

---

[6] "DSSUF" refers to Defendants' Supplemental Statement of Undisputed Facts.

• Plaintiff never went "man down" due to an asthma attack;

• Plaintiff never went to the emergency room due to an asthma attack; and

• Plaintiff never was treated on an urgent basis for an active asthma attack.

(DSSUF No. 13.)

Plaintiff's UHR during the relevant time shows that Plaintiff's blood-oxygen (O2) levels were tested during examinations and always registered normal (95-100 percent). (DSSUF No. 4.) In addition, Plaintiff never displayed the objective signs of an active asthma attack:

• severe wheezing when breathing both in and out;

• coughing that will not stop;

• very rapid breathing;

• tightened neck and chest muscles (called retractions);

• difficulty talking; and

• a pale, sweaty face.

(DSSUF No. 14.)

### 1. Triamcinolone Inhaler

Plaintiff claims that Defendants Clark, Kim, Neubarth, Liberstein, Sisodia, and Rouch were deliberately indifferent by not prescribing him the asthma medications he previously received at other prisons. (DUF No. 6.) Defendants argue that Plaintiff never specified, in either the First Amended Complaint or Appeal 08-02071, which asthma medication(s) he claims Defendants errantly failed to prescribe. (*See* Doc. 12, ¶ 19; Doc. 72 at pp. 48-51.) However, Plaintiff's medical records shows that, four months prior to Appeal 08-02071, his triamcinolone inhaler was discontinued, and mometasone furoate (Asmanex) was prescribed instead. (DUF No. 14.) Plaintiff's other asthma medication prescription, for albuterol, was not altered. (DUF No. 15.)

Defendants correctly contend that Plaintiff is not entitled to his choice of asthma medication or asthma treatment. *See Estelle*, 429 U.S. at 107 (a physician's decision concerning how to treat a patient "is a classic example of a matter for medical judgment."); *Potts v. Stanislaus Cty. Jail Med. Dep't*, No. 115CV01814SABPC, 2016 WL 2593892, at *3

(disagreement over prescription of Valium and Neurontin, instead of Norco or Vicodin for plaintiff's pain does not give rise to a constitutional violation).  Plaintiff is not entitled to triamcinolone inhaler under the Eighth Amendment merely because Plaintiff believes it is the best medication for his asthma.  *Colwell*, 763 F.3d at 1068.

Rather, to prevail, Plaintiff must show that his triamcinolone inhaler was discontinued "in conscious disregard of an excessive risk to [P]laintiff's health."  *See Jackson*, 90 F.3d at 332.  Plaintiff's triamcinolone inhaler was discontinued on November 27, 2007, because triamcinolone inhalers were deleted from the CDCR list of formulary medications in September 2007.  Thereafter, Defendants were not able to prescribe a triamcinolone inhaler for Plaintiff because it had been taken off the formulary list and there was no basis, such as documented treatment failures, to require non-formulary approval.  (DUF No, 12, 13, 18.)  Further, all alternative formulary medications had not yet been tried at the time in question for Plaintiff's asthmatic condition to qualify for non-formulary approval.  (Dr. Feinberg Decl. ¶ 12.)  Ultimately, Triamcinolone inhalers were completely phased out of use in 2010 by the Federal Food and Drug Administration due to environmental concerns.  (DUF No. 12.)

Defendants correctly argue that, whether an official's conduct can be characterized as a conscious disregard depends upon the constraints facing the official.  *Wilson*, 501 U.S. at 303; *Peralta*, 744 F.3d at 1082; *Kilgore v. Grannis*, No. 211CV01745TLNDBP, 2017 WL 840656, at *18 (E.D. Cal. Mar. 3, 2017) (In granting defendant medical staff's motion for summary judgment, a district court considered the fact that the requested medication, Vicodin, was not on the opioid prison formulary for prescription to inmates without undergoing the non-formulary approval process.)  Defendants' evidence shows Plaintiff's triamcinolone inhaler was not discontinued in conscious disregard of an excessive risk to Plaintiff's health, but rather because it was deleted from the CDCR formulary and thereafter completely phased out of use by the FDA.  Defendants' evidence also shows that the medication prescribed to replace Plaintiff's triamcinolone inhaler were medically appropriate for his condition.

Defendants' evidence shows that, in September of 2007, when triamcinolone inhalers were deleted from the CDCR formulary, Dr. Loadholt (not a defendant) prescribed Asmanex in

its place.  (DUF No. 14.)  Plaintiff's prescription for Asmanex was medically acceptable under the circumstances.  (DUF No. 18.)  Asmanex is effective in the treatment of asthma for patients unresponsive to less potent corticosteroids.  (DUF No. 16.)  Unlike triamcinolone inhalers, Asmanex will treat an asthma attack once it has begun.  (DUF No. 17.)  Defendants' evidence shows there were no contraindications for Asmanex in Plaintiff's medical history.  (Feinberg Decl ¶ 13.)  Asmanex has no interaction with Plaintiff's pain medications including acetaminophen, ibuprofen, or naproxen.  (*Id.*)  When Asmanex is used with albuterol, there can be a moderate risk of an increase of blood pressure or irregular heart rhythm.  (*Id.*)  However, Plaintiff's blood pressure was monitored and remained normal, in the range of 119/85.  (*Id.*)  Nothing in Plaintiff's medical records suggests that Asmanex was not medically acceptable.  (*Id.*)

Accordingly, Defendants have met their burden to demonstrate the absence of a genuine issue of material fact regarding the discontinuance of Plaintiff's triamcinolone inhaler.  *In re Oracle*, 627 F.3d at 387.  The burden thus shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial."  *Id.*  Plaintiff's opposition regarding discontinuance of his triamcinolone inhaler is discussed after the section regarding his inmate appeals regarding inhalers since Plaintiff's opposition addresses all of his claims regarding both types of inhalers in a comingled discussion.

### 2.   Albuterol and Asmanex

From January through June 2008, Plaintiff's medical records show no evidence of asthma attacks such as wheezing, shortness of breath or any other indications of asthma attack.  (DUF No. 31.)  Plaintiff's prescriptions for albuterol and Asmanex inhalers were medically acceptable under the circumstances.  (DUF No. 10, 18.)  Defendants' evidence shows that Asmanex was not prescribed for Plaintiff in conscious disregard of an excessive risk to Plaintiff's health, but rather was a medically appropriate medication to substitute for the discontinued triamcinolone inhaler for Plaintiff's asthmatic condition.

On January 27, 2012, Plaintiff was prescribed Xopenex because albuterol was deleted from the CDCR formulary.  (DSSUF No. 14.)  Plaintiff's prescription for Xopenex was medically acceptable under the circumstances.  (DSSUF No. 5.)  Plaintiff's Xopenex prescription continued

throughout the rest of Plaintiff's stay at Corcoran. (DSSUF No. 6.)

On October 21, 2009, Plaintiff's Asmanex prescription was changed to Flovent. (DSSUF No. 7.) Plaintiff's prescription for Flovent was medically acceptable under the circumstances. (DSSUF No. 8.) On June 22, 2012, Dr. Karan documented the change from Flovent to mometasone/formoterol, known as Dulera. (DSSUF No. 9.) Plaintiff's prescription for Dulera was medically acceptable under the circumstances. (DSSUF No. 10.) Plaintiff's Dulera prescription continued throughout the rest of Plaintiff's stay at Corcoran. (DSSUF No. 11.) Plaintiff's asthma was properly managed per community and prison standards of care throughout the time period February 2007 to January 2014. (DSSUF No. 12.) Plaintiff's UHR during the relevant time shows that:

• Plaintiff never went "man down" due to an asthma attack;

• Plaintiff never went to the emergency room due to an asthma attack; and

• Plaintiff never was treated on an urgent basis for an active asthma attack.

(DSSUF No. 13.)

Plaintiff's UHR during the relevant time shows that Plaintiff's blood-oxygen (O2) levels were tested during examinations and always registered normal (95-100 percent). (DSSUF No. 4.) In addition, Plaintiff never displayed the objective signs of an active asthma attack:

• severe wheezing when breathing both in and out;

• coughing that will not stop;

• very rapid breathing;

• tightened neck and chest muscles (called retractions);

• difficulty talking; and

• a pale, sweaty face.

(DSSUF No. 14.) Accordingly, Defendants have met their burden to demonstrate the absence of a genuine issue of material fact regarding Plaintiff's albuterol and Asmanex inhalers. *In re Oracle*, 627 F.3d at 387.

### 3. Processing Plaintiff's Inmate Appeal

Plaintiff claims that Defendants McGuinness, Clark, and Wang are liable because they

denied Plaintiff's inmate appeal regarding his asthma treatment. (DUF No. 23.) However, a "[prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates." *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (citing *Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982)); *see also Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (no liberty interest in processing of appeals because no entitlement to a specific grievance procedure); *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) (existence of grievance procedure confers no liberty interest on prisoner); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988). "Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the Fourteenth Amendment." *Azeez,* 568 F. Supp. at 10; *Spencer v. Moore*, 638 F. Supp. 315, 316 (E.D. Mo. 1986).

Actions in reviewing prisoner's administrative appeal cannot serve as the basis for liability under § 1983. *Buckley*, 997 F.2d at 495. The argument that anyone who knows about a violation of the Constitution, and fails to cure it, has violated the Constitution himself is not correct. "Only persons who cause or participate in the violations are responsible. Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation. A guard who stands and watches while another guard beats a prisoner violates the Constitution; a guard who rejects an administrative complaint about a completed act of misconduct does not." *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) citing *Greeno v. Daley*, 414 F.3d 645, 656-57 (7th Cir.2005); *Reed v. McBride*, 178 F.3d 849, 851-52 (7th Cir.1999); *Vance v. Peters*, 97 F.3d 987, 992-93 (7th Cir.1996). Thus, since he has neither a liberty interest, nor a substantive right in inmate appeals, Plaintiff cannot prove the elements of a constitutional violation purely based on the processing or reviewing of his inmate appeals.

However, Plaintiff may be able to prove the elements for a claim under the Eight Amendment if medical personnel who were involved in reviewing his inmate appeal had both medical training and the authority but failed to intercede and/or to take corrective action in deliberate indifference to his serious medical needs. If Plaintiff meets his burden of proof as to the elements of a claim against a defendant for deliberate indifference to his serious medical needs raised in an inmate appeal, he would likely also be able to meet his burden of proof as to

the elements of a claim against defendants with medical training if they reviewed and ruled against Plaintiff in his medical grievances/appeals on that same issue.

Defendants' evidence shows that Plaintiff submitted only one appeal regarding his asthma -- Appeal 08-02071. (DUF No. 19.) That appeal was reviewed by Defendants Kim and McGuiness, not Wang and Clark. (DUF Nos. 24, 33.) Appeal 08-02071 did not indicate that Plaintiff was suffering from asthma attacks, (DUF No. 22), and Plaintiff's medical record at that time shows no evidence of any asthma attacks. (DUF No. 31.) Plaintiff's examination records January through June 2008 showed no wheezing, shortness of breath or any other indications of asthma attack or that his asthma was not well controlled. (*Id.*) Thus, in reviewing Plaintiff's asthma appeal, Defendants Kim and McGuiness would have seen that Plaintiff's asthma was being successfully treated with albuterol and Asmanex and that these prescriptions had been issued to Plaintiff and were current. (DUF Nos. 26-30.)

Appeal 08-02071 also did not specify that Plaintiff was requesting a triamcinolone inhaler or any specific medication. (DUF No. 21.) Even if the appeal specifically requested triamcinolone, Defendants Kim and McGuiness could not have prescribed it because it had been taken off the formulary list, and there were no justifications for an exception such as documented treatment failures with medications listed in the formulary. (DUF No, 12, 13, 18, 34.)

Thus, Defendants correctly argue that Kim and McGuiness were not deliberately indifferent in denying Plaintiff's asthma appeal (Appeal 08-02071) because the current course of treatment was medically acceptable and nothing in the record indicated the current treatment would cause "further significant injury or the unnecessary and wanton infliction of pain." *See Jett*, 439 F.3d at 1098.[7] Accordingly, Defendants have met their burden to demonstrate the absence of a genuine issue of material fact on Plaintiff's asthma claims based on the handling of his inmate appeals. *In re Oracle Corp.*, 627 F.3d at 387. The burden thus shifts to Plaintiff on

[7] To the extent that Defendants' motion seeks summary judgment based on Plaintiff's failure to exhaust available administrative remedies on his asthma claims subsequent to Appeal 08-02071, (Doc. 88-2, p. 23), need not be considered since, as discussed herein, they are entitled to summary judgment on the merits of Plaintiff's claims. Plaintiff's argument that Defendants are barred from raising this affirmative defense here since they previously filed a motion for summary judgment on his exhaustion efforts (*see* Doc. 111, pp. 4-5), likewise need not be considered.

his asthma claims "to designate specific facts demonstrating the existence of genuine issues for trial." *Id.*

### 4. Plaintiff's Opposition

Plaintiff states that, prior to 2006, his asthma symptoms were adequately controlled with the prescriptions he was provided. (Doc. 122, p. 20.) Plaintiff contends it became uncontrolled when his inhalers where thereafter changed. (Doc. 122, p. 26.)

Plaintiff argues that he had "several asthma attacks" from 2007 through 2013 which he endured calmly and quietly in his cell because prison staff would only take Plaintiff to the ER if Plaintiff looked like he was dying. (Doc. 111, pp. 7-8; Doc. 122, pp. 22, 24.) Plaintiff states that also he quietly endured asthma attacks in his cell because he had to be escorted by two officers at all times and prison staff "were escorting other inmates" and by the time Plaintiff was scheduled to attend his medical appointments "inmates must waited (sic) two weeks." (Doc. 122, pp. 22, 24, 26.) However, Plaintiff presents no evidence to show that he ever told the doctors or medical staff of any events where he endured asthma attacks in his cell. Plaintiff points to a note in his medical records which he submits as evidence of a ventilation problem in his cell that he contends aggravated his asthma. However, the note does not find that there was an actual ventilation problem in Plaintiff's cell, that aggravated Plaintiff's asthma in any way, or that Plaintiff's asthma was not controlled. (Doc. 114, p. 90.) To the contrary, that medical record is titled as a progress check of Plaintiff's asthma and specifically notes that Plaintiff indicated, overall, his asthma was "improving." (*Id.*) Plaintiff points to pages 162-167 of Exhibit M as well, (Doc. 122, p. 22, ¶9), but that is merely the CPHCS procedure governing physician assistants which is irrelevant since none of the Defendants are physician assistants.

Plaintiff also contends that "'Defendants' refused to individually monitor [his] asthma condition and allowed (sic) to exchange his rescue inhaler as need it not every 90 days" and that "at all times defendants ignored [his] constantly (sic) asthma attacks due to CSP-Corcoran-SHU condition and the severe pollution, or pollen in the area by refusing to allowed (sic) [Plaintiff] to exchange his rescue inhaler as (sic) need it." (Doc. 122, p. 23, ¶10.) As evidence, Plaintiff states "see all the dates when defendants conducted their interviews at which they failed to properly

recorded (sic) or to indicate [Plaintiff's] comments and serious concerns on how he was enduring and surviving his asthma attacks inside his cell quiet seated in his bunk all night until the asthma attack disappeared . . ." (*Id.*) Plaintiff does not direct the Court to specific pages of evidence that support this assertion. As noted above, such general reference to what Plaintiff believes some unspecified evidence shows does not meet his burden opposing summary judgment. The Court is not required and declines to attempt to correlate Plaintiff's evidence with the facts he purports establish a dispute where Plaintiff has failed to do so. Fed. R. Civ. Pro. 56(c)(1).

Plaintiff also states that when he had asthma attacks in his cell at night "staff" told him "there is no physicians at night," and that Plaintiff needed to submit "a sick call request which could not be processed until two weeks nor rescue inhaler could be exchanged." (Doc. 122, p. 23, ¶10.) Whether unidentified and unnamed prison staff made such statements to Plaintiff, though undesirable, is not pivotal here particularly since Plaintiff fails to provide any evidence to find that any of the Defendants were aware of and ignored the fact that Plaintiff was allegedly having asthma attacks in his cell at night.

Plaintiff next contends that though at all times in question he was prescribed two inhalers for his asthma (one which he was to take 1 puff twice a day, to be refilled every 30 days and another which he was to take 2 puffs every 6 hours, to be refilled every 90 days) despite needing them sooner, Plaintiff was not allowed to get either refilled before their respective refill time, 30 or 90 days, had lapsed. (Doc. 122, p. 25.) The evidence Plaintiff cites to support this contention shows various prescriptions and that Plaintiff was prescribed inhalers with 30 or 90-day refills. (*See* Doc. 114, pp. 139-176.) However, Plaintiff's evidence does not show that Plaintiff was unable to obtain any of his inhalers before their refill time had lapsed, nor that any of the Defendants in this action knew Plaintiff needed his inhalers to be refilled more frequently, which they failed to address. (*Id.*) While the HCSR CDC 7362 forms Plaintiff submitted as evidence show his requests for refills of his inhalers, in a number of these forms, Plaintiff requested to be changed back to inhalers he received at prior facilities, or merely to obtain a refill. (*Id.*, pp. 18-50, 139-176.) In others, Plaintiff requested an inhaler refill which was immediately granted. (*Id.*) None of Plaintiff's requests suggest that Plaintiff needed his inhalers more frequently than

prescribed and/or was denied refills because a set number of days had not lapsed for any of the Defendants to have had notice that Plaintiff was not able to obtain his prescribed inhalers as needed.  (*Id*.)

Plaintiff also contends that Defendants were required to, but never filled out a CDCCR 7230 ACAT form which reflects the process to monitor an inmate's asthma condition.  (Doc. 122, p. 25.)  While Plaintiff submitted a blank 7230 ACAT form, there is no basis to find that any of the Defendants were deliberately indifferent to Plaintiff's asthmatic condition merely because that form may not have been filled out.  Likewise, Plaintiff's argument that Defendants ignored the long-standing history of his asthma, (Doc. 122, p. 3), without showing something definitive therein which mandated an altered course of treatment, does not show that Defendants were deliberately indifferent to his serious medical needs.

Hence, none of Plaintiff's evidence or arguments demonstrates the existence of a genuine issue for trial on Plaintiff's claims based on the care and treatment he received for his asthma. Defendants are entitled to summary judgment on Plaintiff's asthma claims.

**F.        Defendants' Motion on Plaintiff's Neuropathy/Nerve Pain Claim**

Plaintiff claims that Defendants Kim, Clark, Neubarth, Rouch, Nareddy, Nguyen, and Sisodia were deliberately indifferent by not providing similar pain medications for nerve damage as he had received at other prisons.  (DUF No. 34.)  However, Defendants' evidence shows that Plaintiff had not been diagnosed with nerve damage or having neuropathic pain from 2007-2012. (DUF No. 35.)  In addition, Plaintiff claims that Defendants were deliberately indifferent by not providing morphine, Tylenol-3, codeine, Neurontin or methadone, for nerve damage as other prisons did.  (DUF No. 36.)  But Defendants' evidence shows that Plaintiff has never been prescribed morphine, Tylenol-3, codeine, Neurontin or methadone, or any other narcotic for chronic pain or nerve damage.  (DUF No. 37.)

On or about October 7, 2010, Plaintiff submitted a Form 7362 Heath Care Services Request ("Form 7362") complaining of upper-back muscle pain and a stiff neck purportedly for the past six months.  (DUF No. 38.)  Plaintiff stated on his Form 7362 that ibuprofen did not alleviate the pain.  (DUF No. 39.)

On October 9, 2010, Plaintiff saw the Registered Nurse (RN) who examined Plaintiff's upper back and found full range of motion, no edema, atrophy, hypertrophy, weakness, or tremors. (DUF No. 40.) Plaintiff's gait and stance were steady. (*Id.*) Defendants' evidence shows the October 9, 2010 physical examination results are inconsistent with neuropathy. (DUF No. 41.) The RN noted that Plaintiff "refused Tylenol" and "admitted to taking too much Motrin and Tylenol." (DUF No. 42.)

On October 28, 2010, Plaintiff saw his primary care doctor. Plaintiff denied trauma, and his primary care doctor found no tenderness, but ordered x-rays. (DUF No. 43.) Plaintiff told his primary care doctor that he did not want Motrin or Tylenol. (DUF No. 44.)

On November 3, 2010, Plaintiff's back was x-rayed at Visalia Vascular Institute. (DUF No. 45.) AP, lateral, and swimmer's views of Plaintiff's spine were x-rayed, and it was found that Plaintiff's spine was within normal limits with no evidence of fracture of dislocation. (*Id.*)

The x-rays revealed mild dextroconvex scoliosis of the mid to lower thoracic spine; which is a slight curve measuring 10-20 degrees that curves towards the right side of the body. (DUF No. 46.) Mild dextroconvex scoliosis can occasionally result in mild, chronic or recurring muscle pain. (DUF No. 47.) Proper pharmacologic treatment of muscular pain secondary to mild dextroconvex scoliosis is analgesics/non-steroidal anti-inflammatory drugs including, but not limited to aspirin, acetaminophen, ibuprofen, naproxen, or salsalate. (*Id.*)

On November 8, 2010, Plaintiff submitted a Form 7362 complaining of upper-back muscle pain. (DUF No. 48.) The RN referred the request to Plaintiff's physician. (*Id.*) On November 28, 2010, Plaintiff submitted another Form 7362 complaining of upper-back muscle pain. (DUF No. 49.) In the latter Form 7362, Plaintiff stated that he took salsalate pills "excessively" which caused acid reflux. (DUF No. 50.) On November 30, 2010, Plaintiff was seen by the RN who noted Plaintiff walked without difficulty on examination, had a steady gait, and was able to move up and down and extend without difficulty. (DUF No. 51.) The examination results from that date are inconsistent with a serious musculoskeletal disorder. (DUF No. 52.) During that exam, Plaintiff told the RN: "I have salsalate, I need stronger pain meds." (DUF No. 53.)

On December 3, 2010, Plaintiff's primary care physician again examined Plaintiff. (DUF No. 54.) Defendants' evidence shows Plaintiff's back flexion was 90 degrees, extension was 30 degrees, and lateral bend was 30 degrees -- all within normal limits. Plaintiff's Straight Leg Raise (SLR) test was negative, his strength tested at five out of five bilaterally, and Plaintiff could walk on his tip-toes and heels. (*Id.*) The December 3, 2010, physical examination findings were normal and indicated that Plaintiff had no serious neurological or musculoskeletal dysfunction or pathology. (DUF No. 55.) Plaintiff's primary care physician recommend lower back care, stretching exercises, and naproxen. (DUF No. 56.)

On or about January 11, 2011, Plaintiff wrote appeal Institutional Log Number COR-09-11-10109 ("Appeal 09-11-10109") requesting pain medication for his left arm and upper back. (DUF No. 57.) On January 26, 2011, Defendant Dr. Liberstein examined Plaintiff for Appeal 09-11-10109. (DUF No. 58.) Plaintiff complained to Dr. Liberstein of muscular pain, (DUF No. 59), for which Dr. Liberstein ordered a physical therapy evaluation, (DUF No. 60). Plaintiff was subsequently evaluated by a physical therapist who gave posture education and advice on gentle flexibility exercises. (DUF No. 61.) During Dr. Liberstein's exam, Plaintiff also complained of left arm pain. (DUF No. 62.) Though none of Plaintiff's Form 7362s before Appeal 09-11-10109 mentioned left arm pain, (DUF No. 63), Dr. Liberstein ordered an x-ray of Plaintiff's left arm, (DUF No. 64). The x-ray revealed that Plaintiff's arm was not dislocated; rather it had a small bone spur (exostosis). (DUF No. 65.) An exostosis is the formation of new bone on the surface of a bone which is normally asymptomatic and is not treated. (DUF No. 66.) Non-steroidal, anti-inflammatory drugs are the proper treatment for mild to moderate pain caused by a small bone spur. (DUF No. 67.) Plaintiff already had a prescription for naproxen, a non-steroidal, anti-inflammatory drug, which began in December 2010. (DUF No. 68.)

On February 11, 2011, Defendant Dr. Clark reviewed Appeal 09-11-10109 at the first level and denied Plaintiff's request for stronger pain medication for his left arm and upper back. (DUF No. 69.) On March 11, 2011, Dr. Clark and Defendant Macias provided the second level review and likewise denied Plaintiff's request. (DUF No. 70.) On August 21, 2011, Appeal 09-11-10109 was denied at the third level. (DUF No. 71.)

Plaintiff alleges that Defendants Kim, Nareddy, Liberstein Neubarth, Nguyen, Roush, Sisodia and Clark said he needed morphine, Tylenol-3, codeine, Neurontin, or methadone, but that the medications were not permitted anymore.  (DUF No. 72.)  However, Plaintiff did not have a serious medical need warranting stronger pain medications such as morphine, Tylenol-3, codeine, Neurontin, or methadone.  (DUF No. 73.)  Defendants' evidence shows treatment of Plaintiff's subjective reports of pain by analgesics and non-steroidal anti-inflammatory drugs such as aspirin, acetaminophen, ibuprofen, naproxen, or salsalate was medically acceptable under the circumstances.  (DUF No. 74.)

Defendants' evidence shows that, during the period of March 2006 to January 2014, Plaintiff was never diagnosed as having nerve damage or having neuropathic pain.  (DSSUF No. 15.)  From March 2006 to January 2014, Plaintiff was never prescribed morphine, Tylenol-3 (Tylenol with codeine), Neurontin or methadone, or any other narcotic for chronic pain or nerve damage.  (DSSUF No. 16.)  During the period of February 2007 to January 2014, Plaintiff did not have a serious medical need for opioid (narcotic) or neuropathic pain medications.  (DSSUF No. 17.)  Plaintiff was prescribed NSAIDs such as naproxen, acetaminophen for his claims of chronic pain beginning in December 2010 until he left Corcoran in January 2014.  (DSSUF No. 18.)

### 1.      Narcotic Medications

Plaintiff alleges that Defendants Kim, Clark, Neubarth, Rouch, Nareddy, Nguyen and Sisodia were deliberately indifferent to his serious medical need because they did not provide similar pain medications for nerve damage as Plaintiff received at other prisons.  (DUF No. 36.)  However, Defendants' evidence shows that, at the time in question, Plaintiff had not been diagnosed with nerve damage or neuropathic pain.  (DUF No. 37.)  On the contrary, Plaintiff has been repeatedly examined, and tested negative for neuropathy.  (DUF Nos. 42-43, 47, 53,56-57, 59-60.)  Typical symptoms of neuropathy are radiating pain (such as sciatica or radicular pain), numbness or tingling, "pins and needles" or a "burning" sensation, muscular weakness, atrophy of the muscles and tremors.  On October 9, 2010, Plaintiff was seen by the RN who examined Plaintiff's upper back and found full range of motion and no edema, deformity, atrophy, hypertrophy, weakness, or tremors.  Plaintiff denied numbness and did not complain of tingling.

(Dr. Feinberg Decl. ¶ 23.)

On December 3, 2010, Plaintiff's primary care physician again examined Plaintiff and found his back flexion was 90 degrees, extension 30 degrees and lateral bend was 30 degrees -- all within normal limits. The doctor performed the SLR test which is a neurodynamic test. Neurodynamic tests check the mechanical movement of the neurological tissues as well as their sensitivity to mechanical stress or compression. SLR tests, along with relevant history and decreased range of motion, are the most important physical signs of disc herniation, and the SLR test is one of the most common neurological tests of the lower limb. Plaintiff's SLR test was negative for neurologic dysfunction. In addition, Plaintiff had five-out-of-five strength bilaterally and could both tip-toe and heel-walk. These normal finding indicated that Plaintiff had no serious neurological or musculoskeletal dysfunction or pathology. (Dr. Feinberg Decl. ¶ 32.)

Plaintiff claims that Defendants were deliberately indifferent by not providing morphine, Tylenol-3, codeine, Neurontin, or methadone for nerve damage as he allegedly received in other prisons. (DUF No. 38.) However, Plaintiff's medical records indicate that he has never been prescribed morphine, Tylenol-3, codeine, Neurontin, or methadone, or any other narcotic for chronic pain or nerve damage. (DUF No. 39.) Plaintiff's UHR contains the following "red flags" that suggest that Plaintiff may have been trying to manipulate staff to obtain other narcotics for non-medical reasons:

- Plaintiff abused drugs, including cocaine, before incarceration:
- In Plaintiff's Heath Care Service Requests, he states he is in "severe" pain, yet upon examination he has no objective signs of severe pain:
- Plaintiff refused the non-narcotic medications Tylenol, Motrin, and salsalate: and
- Plaintiff admitted he overdosed his Tylenol, Motrin, and salsalate prescriptions.

(Dr. Feinberg Decl. ¶ 42.)

Plaintiff repeatedly requested stronger pain medications such as morphine, Tylenol-3, codeine, Neurontin, or methadone. (DUF No. 78.) Plaintiff is not entitled to his choice of pain medication. *See Estelle*, 429 U.S. at 107 (a physician's decision concerning how to treat a patient's pain "is a classic example of a matter for medical judgment."). Therefore, Defendants

correctly argue, Plaintiff is not entitled to narcotic pain medication under the Eighth Amendment.

Defendant's evidence shows that, at the time in question, Plaintiff did not have neuropathy and did not have a medical need for narcotic pain medication. (DUF No. 78, see also DUF Nos. 42-43, 47, 53,56-57, 59-60.) Thus, Defendants' evidence shows that their refusal to provide Plaintiff with narcotic pain medication does not equate to deliberate indifference. Accordingly, Defendants have met their burden to demonstrate the absence of a genuine issue of material fact regarding Plaintiff's claim that he should have been prescribed narcotic medication for nerve-damage/nerve-pain. *In re Oracle*, 627 F.3d at 387. The burden thus shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* Plaintiff's opposition regarding treatment for nerve-damage/nerve-pain is discussed after the section regarding non-narcotic treatments since Plaintiff's opposition is an amalgamation of all aspects of this claim.

### 2. Non-narcotic Treatment

Defendants' evidence shows that, at the time in question, Plaintiff has two minor conditions: a small bone spur on his left elbow (DUF No. 70) and mild, dextroconvex scoliosis (a slight right curve) of the mid to lower thoracic spine (DUF No. 48). Neither of these conditions caused neuropathic injury, but they may cause minor musculoskeletal pain. (DUF Nos. 49, 70-71.) Proper pharmaceutical treatment for these conditions is non-steroidal, anti-inflammatory drugs including aspirin, acetaminophen, ibuprofen, naproxen or salsalate. (DUF Nos. 49-50, 72-73.) Plaintiff was prescribed these medications. (DUF No. 44, 58, 61, 66.) However, Plaintiff refused these medications, and repeatedly requested stronger pain medication with no objective need for them. (DUF Nos. 41, 46, 54.) This suffices to meet Defendants' burden to demonstrate the absence of a genuine issue of material fact on Plaintiff's claim that he has a serious medical condition which requires narcotic pain medications.

The Court finds that Defendants have met their burden to demonstrate the absence of a genuine issue of material fact on all of Plaintiff's claims against them. The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact exists. *In re Oracle*, 627 F.3d at 387. Plaintiff must "designate specific facts demonstrating the existence of genuine issues

for trial." *Id.* Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of his contention that a dispute exists. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586 n.11; *First Nat'l Bank,* 391 U.S. at 289; *Strong v. France*, 474 F.2d 747, 749 (9th Cir. 1973).

### 3.    Plaintiff's Opposition

Plaintiff argues that he required hospitalization after he was attacked on May 12, 1998, while housed at HDSP. (Doc. 122, p. 27.) In that attack, Plaintiff sustained approximately 20 puncture/stab wounds to his hands, shoulders, arms, chest, abdomen, lungs, and extremities. Plaintiff says that he was treated with morphine and other drugs for his injuries, but that he cannot produce evidence showing this because Defendants responded to his discovery requests by indicating his medical chart was too large to produce. (*Id.*) While Plaintiff filed a motion to compel, (Doc. 77), it was denied to the extent that Plaintiff sought further responses from any of the Defendants, his motion was denied since Plaintiff failed to specifically identify any discovery response that he felt was deficient, nor did he identify any objection which he felt was unjustified (Doc. 84). In any event, Defendants would not be required to produce copies of Plaintiff's medical records since all such records from his time in custody are equally available to Plaintiff via his central file. Plaintiff may not avoid summary judgment by attempting to raise an untimely discovery dispute.[8]

Plaintiff contends that his nerves were "obviously . . . seriously damaged" in the 1998 attack because after it he was given a chrono for waist-chains so that he would not be cuffed behind his back. (Doc. 122, p. 27.) However, Plaintiff provides no evidence to support the conclusions that he sustained nerve damage or that nerve damage was the underlying reason for the chrono prohibiting being cuffed behind his back -- as opposed to another medical issue, such as damage to his joints, lungs, and/or muscles.

---

[8] Plaintiff does not request deferred consideration of Defendants' motion under Rule 56(d), nor does he meet the burden of such motion. It is noteworthy that Plaintiff previously requested deferred consideration under Rule 56(d), but did not do so based on inability accessing his medical records; rather Plaintiff desired to depose Defendants' expert witness. (*See* Docs. 95, 101.)

Plaintiff contends that his nerve damage was worsened while exercising, in April of 2010, when he injured the nerves in his shoulder. (Doc. 122, p. 27.) Plaintiff indicates that he "felt pain like someone puncturing [his] nerves with a needle." (*Id.*) Plaintiff states that his injuries at that time required an MRI. (*Id.*) However, Plaintiff presents no evidence to support his opinion in this regard; nor does Plaintiff submit any medical evidence that showed nerve damage or any medical basis to find that Plaintiff sustained nerve damage in April of 2010 which caused him pain. Further, regardless of whether MRI should have been ordered, Plaintiff does not identify which Defendant(s) he feels should have ordered an MRI for him (Plaintiff's general statements that "Defendants" should have done something is not specific enough to meet his burden against any of the Defendants); nor, as previously noted, does Plaintiff provide any evidence that he is qualified to opine that an MRI was medically necessary at that time

Plaintiff argues that, between 2010 and 2013, Defendants refused to recommend Plaintiff see a specialist for his nerve damage and instead recommended Plaintiff have x-rays, but knew that Plaintiff didn't have any broken bones from the April 2010 incident because Plaintiff described his injuries to them. (Doc. 122, p. 28.) Again, this argument is too general to ascribe any failings to a specific Defendant to beet Plaintiff's burden. Additionally, mere disagreement with a defendant's professional judgment concerning what medical care (and ergo diagnostic testing thereon) is most appropriate under the circumstances is insufficient to establish violation of the Eighth Amendment. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016).

Plaintiff contends that, from 2006 through 2013, he "filed several CDCR-Health Care Service Request forms (CDCR-HCSR) 7362 Forms" to which "defendants failed to timely respond." (Doc. 122, p. 21, ¶7.) Plaintiff states "all the several multiple dates when unknown physicians and defendants (sic) interviews conducted to make recommendations or approvals or denials failed to properly recorded (sic) Mr. Rios' concerns or they (sic) reasons to recommended or not recommend Mr. Rios to be seen by an specialist or MRI, their reports were inconsistent." (*Id.*) There are a couple of reasons why statements such as this in Plaintiff's declaration fail to establish a triable issue of fact. First, this paragraph of Plaintiff's declaration is not specific enough to link any Defendant(s) in this action acted engaged in specific acts, or failed to act out

of deliberate indifference to Plaintiff's medical conditions.  Second, though Plaintiff cites to Exhibits A through F, (*id.*), he fails to direct the Court to any specific document in those exhibits which supports his contentions.  The Court declines to ferret through the 158 pages contained in Exhibits A through F to find support for Plaintiff's contentions against one or more of the Defendants in this action where Plaintiff has failed to do so.

Likewise, Plaintiff's contention that from 2007 to 2014 "Defendants J. McGuinness, T. Macias, E. Clark, J. Wang, J. Neubarth, J. Kim, C. Nereddy, A. Liberstain, H.N. Nguyen, P. Rouch, and Sisodia conducted several interviews" regarding Plaintiff's condition and health care requests, but failed to properly reflect Plaintiff's concerns is not specific enough to show that any specific Defendant interviewed Plaintiff and filed to accurately note Plaintiff's complaints out of deliberate indifference to any medical need Plaintiff may have had.  (Doc. 122, p. 22, ¶8.) Plaintiff argues that these Defendants did not comply with procedures established by the California Prison Health Care Services because several of their orders did not properly reflect their interviews with Plaintiff or their recommendations.  Here again, while Plaintiff cites to exhibits (*id.*, citing Exhibits B through L), he fails to direct the Court to any specific page or few pages of those exhibits, and the Court declines to dig through the 153 pages therein attempting to find support for Plaintiff's contention.

Plaintiff also contends that he never asked Defendants to prescribe narcotics or morphine or drugs for his nerve pain, but that Defendants "complained and indicated that due to budgetary restraints they could not recommend such appropriate medication for nerve damage." (Doc. 122, p. 28 ¶20.)  However, Plaintiff does not submit any evidence showing as much and the Court finds none.  Further, Plaintiff's mere sentence on this issue fails to sufficiently link any of the Defendants to any specific conversation or circumstance in which any of them told Plaintiff they were unable to prescribe appropriate treatment because of budgetary constraints.[9]  (*Id.*) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

---

[9] It is noteworthy that Plaintiff presents no evidence on this issue which the Ninth Circuit found pivotal on remand. (*See* Docs. 21, 23.)

statements, do not suffice," to state a cognizable claim, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and certainly do not suffice to oppose summary judgment where Plaintiff has the burden "to designate specific facts demonstrating the existence of genuine issues for trial." *In re Oracle*, 627 F.3d at 387.

Plaintiff also contends that after his initial injury in 1998, the doctors told him to exercise little by little, which he did, and that he did not ask for pain medications until he reinjured his shoulder in 2010 while exercising. (Doc. 122, p. 29.) This may be true, but it is of no consequence because whether Plaintiff requested pain medications before he reinjured his shoulder in 2010 does not establish that Plaintiff had nerve damage which required different treatment than that which he received; nor does it establish that any of the Defendants were aware that Plaintiff had nerve damage which they deliberately failed to treat.

Finally, Plaintiff submits evidence that in 2018, physicians at CSP-Cor recommended Neurontin for Plaintiff's nerve damage based on a review of Plaintiff's medical records from the 1998 and 2010 incidents. (Doc. 122, p. 29.) However, diagnosis and treatment of a condition in 2018 does not establish that Plaintiff had that condition, which any of the Defendants were aware of and ignored years earlier (from 2007 to 2014) when the events at issue occurred.

None of Plaintiff's evidence shows that Plaintiff had nerve damage from 2007 to 2014. Likewise, none of Plaintiff's evidence shows the existence of a genuine issue for trial on Plaintiff's claims based on the care and treatment of pain that Plaintiff perceived to be caused by nerve damage. Thus, Defendants are entitled to summary judgment on Plaintiff's claims thereon. Since Defendants are entitled to summary judgment on the merits of all of Plaintiff's claims, their request for qualified immunity and for summary judgment based on the statute of limitations need not be reached.

## **ORDER**

For the reasons set forth herein, this Court finds that Defendants Clark, Kim, Liberstein, Macias, McGuinness, Nareddy, Neubarth, Nguyen, Sisodia, Rouch, and Wang are entitled to

judgment as a matter of law on the merits of Plaintiff's claims against them. Accordingly, Defendants' Motion for Summary Judgment, filed on February 2, 2018 (Doc. 88), is GRANTED. The Clerk of the Court is directed to enter judgment against Plaintiff and for Defendants and to close this action.

IT IS SO ORDERED.

Dated: __**February 28, 2019**__          _____**/s/ Lawrence J. O'Neill**_____
                                          UNITED STATES CHIEF DISTRICT JUDGE